# Espalla v. The State.

*Indictment for Uttering Forged Deed.*

1. *Forgery; indictment; knowledge.*—Neither the form of indictment set out in the Code, nor the statute defining the offense of forgery, requires that the indictment should charge that defendant had knowledge of the forgery at the time of its utterance, and such omission does not invalidate the indictment.

2. *Same; competency of evidence.*—On the trial of a defendant indicted for the forgery of a deed, it is competent for the State to show' by the record of a deed in the probate office, that the names purporting to be signed as grantors to the alleged forged paper, are the same as the grantees of the same lands as shown by the recorded deed; it is also competent to show that the grantees, shown by said record, did not execute the instrument purporting to have been signed by persons of exactly the same names; and in connection with the above it was competent for one of said grantees to testify that there was no other family of their name (Faulkner) in the county where said lands are situated, and said alleged forgery purports to have been executed, and that witness knew of no family of Faulkners which had the same christian names as their own.

3. *Same.*—The fact that the defendant did not seek to sell the lands, nor exercise ownership, has no tendency to show his innocence of the charge of forging the deed, or of uttering a false deed with intent to defraud, and is inadmissible as testimony.

4. *Same.*—The question as to whether or not a deed is "a legal deed" is one entirely for the court.

5. *Utterance of forged deed; what constitutes.*—The filing of a forged deed for record in the probate office is, as matter of law, the utterance of a forgery, if accompanied with the intent to defraud.

APPEAL from Mobile City Court.

Tried before Hon. O. J. SEMMES.

The defendant was indicted for forgery under section 3852 of the Code. The indictment follows the form laid down in the Code. The defendant demurred to the indictment on the ground that it failed to charge that the defendant uttered the purported forged deed, knowing the same to be forged. The demurrer was overruled and the defendant excepted. The State introduced in evidence a deed purporting to have been executed by Major J. Faulkner to his six children, naming them as Beulah B. Faulkner, Lewis S. Faulkner, M. C. Faulkner, M. K. Faulkner, H. E. Faulkner, and S. J. Faulkner. The State introduced as a witness Beulah B. Faulkner, who testified that in 1888 her father, Major J. Faulkner, made a deed to his six children conveying the land described in the indictment; that the names of said six children are correctly set out in the deed except that none of said children had the name of H. E. Faulkner, but that she had a sister whose name was L. E. Faulkner, but whose name, by mistake, did not appear in her father's deed. Witness further testified that she had never signed, or authorized any one to sign for her the deed exhibited to her, (referring to the alleged forged deed); witness further testified that her brother Lewis S., whose name also purported to be signed to the alleged forged deed, had lived in New Orleans ever since 1880, and had never since that time, within knowledge of witness, been in city of Mobile, where said instrument purported to have been executed. The witness testified that all of the grantees under her father's deed lived in Mobile, except her brother Lewis; that she knew of no other Faulkners living in Mobile, where said lands are situated, and where said alleged forged deed purports to have been executed, and that she knew of no family of Faulkners, having six in family, or having the same christian names as herself and brothers and sisters.

The signature, H. E. Faulkner, to the alleged forged deed was made by mark and witnessed. The State asked witness, Beulah Faulkner, if her sister L. E. Faulkner

was educated; to which the witness replied her sister
was educated and could write.   The State then offered
in evidence the record of the deed from Major J. Faulk-
ner to his six children, the original of which had been
previously introduced.   The State then introduced suc-
cessively as witnesses Mary K. Barnett (formerly
Faulkner) and Laura E. Faulkner, both of whom
testified they had never signed the alleged forged deed
nor authorized anyone to sign the same for them.   The
State then introduced a certified copy of the alleged
deed (it being admitted by the defendant that the orig-
inal was lost).   This deed purported to be a conveyance
to defendant executed by the grantees named in the deed
of Major J. Faulkner of the premises therein described.
The defendant severally objected and excepted to each
question of the solicitor which elicited the evidence above
set out, and to each answer of the witnesses; also to the
introduction of the original deed from Major J. Faulk-
ner, the record thereof, and the certified copy of the pur-
ported forged deed.   There was other evidence intro-
duced by the State merely corroborative of what is above
set out.   The defendant was introduced as a witness in
his own behalf and testified that he was approached by
a man who represented himself to be Lewis S. Faulkner
and who said that he, his brothers and sisters would sell
the premises in question to to defendant for the sum of
$200, and defendant agreed to purchase.   That defend-
ant then prepared a deed and gave it to said Lewis S.
Faulkner with directions that he and the others should
come to his office and execute the same before one Tut-
tle, who was a notary public.   "That on July 2, Faulk-
ner came to my office with some persons whom he rep-
resented to be the other Faulkner heirs, I was out at the
time, but when I came in I found the deed properly
signed and acknowledged, and the parties all there ready
to deliver the deed.   Upon examining the deed I found
the signatures to correspond with the names of the
grantees appearing in deed from Major J. Faulkner; I
then paid Lewis Faulkner $200.   John Harrison and
George Kearns saw me pay the money; they were wit-
nesses to the deed.   I have never seen any of the parties
since."   Defendant was then asked by his counsel, "Have
you had an offer for that property?"   The solicitor ob-
jected to the question as irrelevant and immaterial.   De-
fendant's counsel then stated that the purpose of the

[Espalla v. The State.]

question was to show that defendant had never sought to
exercise any ownership over the property, or to dispose
of the same, since he was informed there was something
wrong about the transaction. The court sustained the
objection, and refused to allow the question, and defen-
dant excepted.

E. M. Tuttle was introduced for the defendant and
testified that he was the notary public before whom the
deed to defendant was acknowledged. The defendant
had previously mentioned the matter to witness. Lewis
S. Faulkner acted as spokesman for the party. All of
them signed the deed and acknowledged it before wit-
ness. John Harrison and George Kearns witnessed the
deed. Witness left the office as defendant came in, and
he saw no money passed.

John Harrison, in behalf of defendant, testified that
he witnessed the deed in defendant's office, and that
Tuttle read over the deed to the parties before they signed
it; defendant came into the office immediately after the
deed was signed and witness saw him hand over some
money to the man who had signed as Lewis S. Faulkner,
but did not know the amount.

John K. Glennon, a witness for the defense, testified
that he had been in the real estate business twenty years.
In response to a question as to whether or not he always
knew the parties in a real estate transaction in which he
was interested, answered, "I frequently represent par-
ties to real estate transactions, when I do not know the
parties, and in which the parties do not know each other
personally." The court, ex mero motu, ruled out and ex-
cluded from the jury this answer of witness, stating that
said evidence was irrelevant and immaterial; and to this
action of the court the defendant excepted. The defend-
ant introduced as a witness in his behalf one James
Maury, who testified that about a year ago a man repre-
senting himself as Lewis S. Faulkner requested witness
to ascertain for what sum witness could repurchase said
lands from Espalla. The defendant asked in writing
several charges, each of which was tantamount to the
general charge in his favor, and each of which was re-
fused by the court and defendant excepted. The jury
brought in a verdict of guilty, against the defendant.

CHAS. W. TOMPKINS and EDWARD M. ROBINSON, for
appellant.

W. C. FITTS, Attorney-General, for the State.

McCLELLAN, J.—This is an indictment under section 3852 of the Code charging the false making &c. of a deed, or the uttering of a deed which had been forged &c. The indictment is in the form prescribed—F. 49, p. 272 Code—and pursues the language of the statute defining the offense. Neither the form nor the statute makes knowledge of the fact that the deed uttered had been forged an element of the offense further than is implied from the requirement that an intent to defraud is necessary to constitute the crime. This intent is alleged, and the indictment is not bad for omitting to aver that the defendant uttered the deed knowing the same to be false or forged. The trial court properly overruled defendant's demurrer to the indictment.

The deed as to which the charge is made purported to be signed by Beulah B. Faulkner, Lewis S. Faulkner, M. C. Faulkner H. E. Faulkner, M. K. Faulkner, and S. J. Faulkner. It was shown that Major J. Faulkner, intending to convey the land covered by the alleged forged deed to his six children whose names are given above, except that no one of them has the name of H. E. Faulkner, but, instead, one of his daughters was named Laura E. Faulkner, executed a conveyance wherein by some unexplained inadvertence the name of this grantee had been written H. E. instead of L. E. Faulkner, and that this deed was recorded in the probate office of the county soon after its execution, the deed itself being kept by said Beulah, who produced it on the trial. The theory of the prosecution was that the defendant, a real estate agent, seeing this deed on the record, got the description of the land and the names of the grantees from it, and, preparing a deed conveying the land to himself, forged the names of the grantees thereto, or that this having been done by a third person, the defendant uttered the forgery with intent to defraud &c.

In this view of the case, in connection with evidence that the said Beulah and L. E. Faulkner did not sign the deed to Espalla, nor authorize the execution thereof, it was clearly competent as going to show that the deed in possession of said Beulah was intended to be made to L. E. Faulkner, and others the children of Major J. Faulkner and not to H. E. Faulkner and others, to prove that there was no other family of Faulkners in Mobile county,

where the land was situate and the deed was executed, that the witness, Beulah Faulkner, "did not know of any other family of Faulkners consisting of six children with the same Christian names" as this family, and that she, the witness had no sister named H. E. Faulkner, but that one of her sisters was named L. E. Faulkner; and that the objections to this evidence were properly overruled.

The original deed from Major J. Faulkner to his said children was competent to identify the land and grantees and to show the grant to and existence of the title in them, abstractly, and also as a predicate for further evidence that these grantees had not conveyed the property to the defendant; and the record of that deed in the probate office was properly admitted for the reason, among others perhaps, that this accounted for the fact that the deed to Espalla contained a description of the land and the names of the grantees in the original deed consistently with the fact that such deed had been all along in possession of Beulah Faulkner and also consistently with the State's contention that Beulah and others of the grantees had not executed the alleged conveyance to Espalla. And this latter position is strengthened by the fact—and the fact itself was therefore, for this additional reason, competent—that a mistake as to the name of the grantees was made in the original deed, in copying it or otherwise, and that this mistake was repeated in the deed purported to have been executed to Espalla, since it is unreasonable to suppose that this grantee if she had really undertaken to convey the land would have signed a name other than her own.

The name "H. E. Faulkner" is subscribed to the Espalla deed by mark, indicating, of course, that she was illiterate and unable to write her name. It being clearly shown that "H. E. Faulkner" was in truth L. E. Faulkner, it was obviously proper to receive evidence that she was an educated person, which at least imports that she could write her name. This evidence had a clear tendency to show that she did not execute the paper at all, as, had she done so, the subscription would have been by her own and not by the hand of another with her mark attached.

We are unable to see that the fact Espalla did not seek to sell the land nor to exercise any ownership over it "after he was informed that there was something wrong about the transaction between Faulkner and himself"

[Espalla v. The State.]

(as his counsel put it) has any tendency to show his innocence of the charge of forging the deed, or of uttering a false deed with intent to defraud, This fact was in the nature of subsequent exculpatory conduct—if indeed it can be said even in the abstract to indicate innocence rather than guilt; and was well excluded : a defendant after being charged with the crime cannot thus manufacture evidence for himself.

The fact that the witness Glennon "frequently represented parties in transactions with real estate when he did not know the parties, and in which the parties did not know each other personally," was wholly irrelevant, and being so the court, of course, did not err in excluding it *ex mero motu.*

In its instruction to the jury referring to the certified copy of the alleged forged instrument, that "the deed in evidence is a legal deed," the court manifestly had reference to the formalities required in the preparation and execution of the paper—its contents, and signature, and attestation or acknowledgment—that on its face it carried the legal title to the property described in it. Whether the court erred in this or not we cannot say, since the deed is not set out in the bill of exceptions. All that appears therein in relation to this paper, however, goes to show that *prima facie* it was a formal conveyance of the land described in it. And whether or not the paper was a deed, made the subject of forgery by the statute under which this defendant was indicted, was purely a question for the court.

The law is, as charged by the court, that the presenting for record at the probate office of a forged deed is the uttering thereof.—8 Am. & Eng. Ency. of Law, p. 492. The charges requested by the defendant, being the general affirmative charge in several forms and the general charge that there could be no conviction of forgery under this indictment, are so patently unsound and improper when referred to the evidence that we deem it unnecessary to discuss them. For the same reason we have pretermitted all reference to several exceptions reserved by the defendant to the rulings of the court on the competency of evidence, and might have thus dismissed some of those about which we have written. We find no error in the record, and the judgment of the City Court must be

Affirmed.